UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VANOCUR REFRACTORIES, LLC, | ) | CASE NO.: 1:23-cv-02162 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| FOSBEL, INC., *et al.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court is the parties' dispute over the construction of claim terms in Patent No. 8,266,853 (the "'853 Patent"). Plaintiff Vanocur Refractories, LLC ("Vanocur") filed opening and responsive claim construction briefs. (Docs. 42, 50.) Defendant Fosbel, Inc. ("Fosbel") filed opening and responsive briefs as well.[1] (Docs. 43, 51.) The parties agreed to forego a claim construction hearing. (Sept. 24, 2025 Order at 1956.)[2]

## I. BACKGROUND

This case relates to coke ovens, which are specialized ovens used for heating coal into a material known as coke. ('853 Patent at 1:18-19.) Coke is then used to make iron and steel. (Doc. 42-2 at 456.)

[1] Defendant Ceramic Holdings Inc. ("Ceramic Holdings") was joined as a party via amended complaint after Vanocur and Fosbel finished claim construction briefing. (Doc. 57.) Ceramic Holdings had ample time to submit its own arguments regarding claim construction but chose not to; so the Court will proceed on Vanocur's and Fosbel's briefs alone.

[2] Except for citations to the '853 Patent (Doc. 42-1), record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination. Citations to the '853 Patent are to internal column and line numbers.

The modern coke oven consists of a large chamber, up to six meters high and fifteen meters in length. ('853 Patent at 3:37-38.) Coal sits on the floor while burning gas flows up through the oven walls to heat the coal. (*Id.* at 3:39-46.) Meanwhile, the oven funnels exhaust heat and air back down through its walls to be recycled in a structure known as the regenerator. (*Id.* at 1:26-28; Doc. 42-2 at 456.) One way coke ovens recycle this waste is by using it to pre-heat incoming gas on its way up to the coke oven. ('853 Patent at 1:26-30.) But while this exhaust air can be used to heat incoming gas indirectly as the two flow past each other, they cannot mix. Otherwise, the gas might prematurely ignite and cause an explosion. (Doc. 42-3 at 489.) To avoid this issue, a third structure known as a corbel sits between the coke oven and regenerator. ('853 Patent at 1:31-35, 3:59-63.) The '853 Patent concerns this last structure, the corbel.

Corbels function by using a series of interwoven passageways to direct gas, fresh air, and exhaust to their proper locations without undesired mixing. (*Id.* at 3:59-63.) One common way to orient those passageways is in a "gun-type" arrangement. (*Id.* at 3:63-4:17.) In a gun-type arrangement, there is a main, horizontal gas line that runs through the corbel, with vertical offshoots at regular intervals. (*Id.*) Meanwhile, other passageways to the side of that main line carry fresh air to be mixed with that gas, or exhaust air used to pre-heat the gas. (*Id.*) Figure 3 below shows how this might look, depicting both the main and offshoot gas lines (32 and 30, respectively), as well as the separate passageways for air off to the side of those gas lines (28). (*Id.* at 5:32-35.)

Fig. 3




Traditionally, corbels were constructed with "hundreds or thousands of silica bricks, of many differing shapes." (*Id.* at 4:18-21.) As can be imagined, that was a difficult and time-consuming task. (*Id.* at 1:62-2:1, 4:32-33.) It also made for inefficient coke ovens, because the many bricks created many joints through which air and gas could escape and prematurely combust before reaching the oven. (*Id.* at 1:50-53, 2:1-7, 4:26-27.) The '853 Patent tries to fix this issue by casting larger monolithic blocks to use in corbel construction rather than continuing to use small bricks. (*Id.* at 2:33-44.) By using larger blocks, the '853 Patent aimed to reduce construction time and reduce the number of joints from which gas or air could leak. (*Id.*)

Specifically, Claim 1 of the ’853 Patent, which the Court finds to be representative for claim construction purposes, recites the following (disputed terms bolded and underlined):

A corbel comprising:

a first tier having first blocks, each of the first blocks comprising a first, substantially horizontal aperture extending through the first block from a front surface to a back surface and a second, substantially vertical aperture formed through a top surface of the block, extending into the first aperture, the first blocks being arranged on a substantially planar surface to align the respective first apertures to define a first, substantially horizontal passageway;

a second tier having second blocks, each of the second blocks comprising a third, substantially vertical aperture extending through the second block from a top surface to a bottom surface, the second blocks being disposed **<u>above</u>** the first tier of blocks to align the third aperture of each of the second blocks with the second aperture of the first blocks to form a second passageway;

a **<u>third passageway extending diagonally from the top of the one of the second blocks to a side of at least one of the first and second blocks</u>**; and

a **<u>gas source</u>** for providing gas to the first passageway.

(’853 Patent at 8:17-37.)

## II. LEGAL STANDARD

### A. Claim Construction

Claim construction is a question of law for courts to decide. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325, 135 S. Ct. 831, 190 L. Ed. 2d 719 (2015). When courts construe a claim, their goal is to “determine the meaning and scope of the patent claims asserted to be infringed.” *O2 Micro Int’l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (alteration adopted) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff’d*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)). That is because “the claims of a patent define the invention to which the patentee is entitled the

right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

To construe a claim, courts "begin with the words of the claims themselves." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) (citation omitted). Those words "are generally given their ordinary and customary meaning" as understood by a "person of ordinary skill in the art ['POSITA'] . . . at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (citations omitted). That said, sometimes "the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In those cases, courts need not engage in "an obligatory exercise in redundancy" by restating the claim term's ordinary meaning so long as there is a single ordinary meaning that resolves the parties' dispute over the claim's scope. *O2 Micro*, 521 F.3d at 1362 (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Construction starts from the intrinsic record, including both the specification and prosecution history. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). Of the intrinsic record, the specification is the most important. *Phillips*, 415 F.3d at 1315. The specification "is always highly relevant to the claim construction analysis" and in fact, "[u]sually[] it is dispositive." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). For this reason, the Federal Circuit has called the specification "the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics*, 90 F.3d at 1582).

Courts may venture beyond the intrinsic record to consider extrinsic evidence as well. *Id.* at 1317. Extrinsic evidence is "external to the patent and prosecution history, including expert

and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980). However, extrinsic evidence is entitled to less weight than intrinsic evidence. *Id.* In fact, if the intrinsic evidence "resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003).

**B. Indefiniteness**

Under 35 U.S.C. § 112, ¶ 2 (2009),[3] a patent's claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as [his] invention." This is known as the definiteness requirement. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 134 S. Ct. 2120, 189 L. Ed. 2d 37 (2014). If a patent or claim fails to meet this requirement (*i.e.*, it is indefinite), that patent or claim is invalid. *Id.* at 902.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 901. To satisfy this standard, "a patentee need not define his invention with mathematical precision." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citation omitted). Nor does definiteness require such precision that "a potential infringer be able to determine *ex ante* if a particular act infringes the claims." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 40 (Fed. Cir. 2020). That is because language has "inherent limitations," so "[s]ome modicum of uncertainty" must be tolerated as the price of promoting innovation. *Nautilus*, 572 U.S. at 909. At bottom,

---

[3] Because the '853 Patent was filed well before the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), the pre-AIA version of § 112 applies. *Id.* § 4(e), 125 Stat. at 297.

definiteness "mandates clarity, while recognizing that absolute precision is unattainable." *Id.* at 910. As such, definiteness requires only reasonable certainty about a patent's scope, not absolute certainty. *Id.* at 901.

Moreover, patents are presumed to be valid once they are issued. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011) (citing 35 U.S.C. § 282). To overcome this presumption, a party challenging the validity of a patent must prove its invalidity defense with clear and convincing evidence. *Id.* Parties asserting indefiniteness as a defense must therefore clear the high clear-and-convincing bar in order to prevail. *Sonix Tech.*, 844 F.3d at 1377.

## III. ANALYSIS

### A. "Above"

| **Vanocur's Construction** | **Fosbel's Construction** | **Court's Construction** |
|---|---|---|
| Directly above | In a higher, but not necessarily directly adjacent, place | No construction needed; plain and ordinary meaning. |

The parties first dispute the meaning of "above," which appears in Claims 1, 2, 7, 9, 10, and 17. Recall that Claim 1, which is representative for purposes of claim constructions, uses "above" as follows:

> a second tier having second blocks, each of the second blocks comprising a third, substantially vertical aperture extending through the second block from a top surface to a bottom surface, the second blocks being disposed **above** the first tier of blocks to align the third aperture of each of the second blocks with the second aperture of the first blocks to form a second passageway;

('853 Patent at 8:27-33 (emphasis added).) The crux of the parties' dispute is whether "above" requires adjacency. Put differently, the question is whether the '853 Patent covers only corbels where the blocks are layered directly on top of one another, or if it also covers corbels where there is some space or other structure between different block layers.

To start, the Court observes that "above" does not require adjacency in ordinary usage. Block A can be said to be "above" Block B whether it sits directly on top of Block B or it is held 100 feet higher. Vanocur appears to concede as much about the ordinary meaning of "above." (Doc. 42 at 416.) But, Vanocur contends, "above" carries a specialized meaning within the '853 Patent. The Court disagrees.

As support for its position, Vanocur first points to language in Claims 1 and 2 that requires blocks in higher layers to "align" with blocks in lower layers in order to form passageways. (*See* '853 Patent at 8:30-33, 8:41-43.) According to Vanocur, this is only possible "[p]ractically speaking" if the layers of blocks are adjacent to each other. (Doc. 42 at 416.) The Court rejects this argument as a factual matter. It may be easiest to construct a corbel with blocks layered adjacent to each other, but Fosbel's expert explained that it is "technically possible" to build a corbel without adjacent block layers. (Doc. 42-3 at 491.)[4] Feasibility of non-adjacent layers aside, Vanocur's argument situates any adjacency requirement in the meaning of "align," a separate claim term from "above."[5] This argument therefore offers little help when construing "above."

Secondly, Vanocur points to Claim 10, which recites "laying the second tier of blocks above the first tier of blocks." ('853 Patent at 9:14-15.) Again, Vanocur appeals to feasibility, suggesting that the second tier must rest directly on the first tier else there would be nothing to

---

[4] Vanocur objects to Fosbel's expert, Thomas Vert, and asks the Court to disregard his testimony because he is underqualified to serve as a POSITA. (Doc. 42 at 427-28.) The Court finds that Vert is sufficiently qualified to credit as a POSITA and expert given his years of experience working on coke ovens. (*See* Doc. 42-3 at 484-88; Doc. 42-6 at 546-47.) Accordingly, the Court OVERRULES Vanocur's objection and considers Vert's testimony.

[5] The Court expresses no opinion on the meaning of "align" because the parties have not asked the Court to construe that term.

lay the second tier on. (Doc. 42 at 417.) But nothing in Claim 10 precludes the use of some other, unclaimed structure to hold the second tier of blocks above the first indirectly. All that Claim 10 requires is that the second tier be somewhere above the first.

Contrary to Vanocur's view, the claim language implies that "above" does not require adjacency. Specifically, Claim 7 (which depends from Claim 1) recites a "foundation block, the first tier and second tier being positioned above the foundation block." ('853 Patent at 8:61-62.) That is, Claim 7 describes both the first tier being above the foundation block *and* the second tier being above the foundation block. Claim 1, however, requires that the second tier *also* be above the first tier. (*Id.* at 8:27-33.) Then from bottom to top, the order of blocks is foundation, first tier, second tier—it is not possible for the second tier to be adjacent to the foundation blocks even though it must be "above" those blocks. Vanocur's only response is that the "combined" tiers sit directly on top of the foundation blocks and are adjacent to those blocks. (Doc. 42 at 419.) The problem with this framing is that Claim 1 recites the first and second tiers as separate structures; there is no basis for assuming that dependent Claim 7 now treats them as a single structure. As such, the claim language confirms that "above" does not require adjacency.

Lacking support from the claim language, Vanocur turns to the specification. Noting that there is nothing in the specification disclosing a corbel that contains space or some other structure between different tiers of blocks, Vanocur asserts that "above" must take on a narrower definition than its ordinary meaning. For example, Vanocur flags that every depicted corbel in the specification shows that the second tier of blocks sits on top of and adjacent to the first tier. (*See, e.g.*, '853 Patent figs.7-8.) Vanocur also points to how the specification uses "directly above" once, calling this an express definition of the term "above." (*Id.* at 6:62-63.) This argument misses the mark.

There is a "'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (quoting *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999)). A litigant "may overcome this 'heavy presumption' and narrow a claim term's ordinary meaning, but he cannot do so simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Id.* (citations omitted). There are only a few ways to do so. As relevant here, a litigant may overcome the presumption by showing that "the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term." *Id.*

Vanocur has done little more than point to preferred embodiments in the specification as reason to limit "above" from its ordinary meaning. The Federal Circuit has repeatedly warned courts from "import[ing] a limitation from the preferred embodiments to restrict the meaning of a claim term." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1327 (Fed. Cir. 2003) (collecting cases). The Court will not do so here.

In an attempt to avoid this long line of precedent, Vanocur attempts to squeeze its construction into the line of cases that allow patentees to act as their own lexicographers. However, the "standard[] for finding lexicography . . . [is] exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.* (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). Certainly, a definition need not be express and may be established "by implication" if the patentee uses a claim term in a consistent way "throughout the entire patent specification." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1052 (Fed. Cir. 2010)

(quoting *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001)). But the definition must still be clear.

Here, Vanocur first attempts to argue express definition, citing to a line in the specification saying that "[t]he tier placed directly above the gunblocks and later block includes end modules." ('853 Patent at 6:62-63.) That statement obviously is not an express definition since it does not purport to define the word "above." As a backup, Vanocur tries to argue implied definition. While this comes closer given the specification's uniform usage of "above," the Court ultimately concludes that it is not clear enough that the '853 Patent intended to define "above" in this specialized way. That is because, as the Court discussed above, Claim 7 implies that "above" does not require adjacency. "Above" was not used consistently to mean "directly above" throughout the entire patent; so it takes on its ordinary meaning.

The only remaining question is whether to simply give "above" its ordinary meaning or to adopt Fosbel's construction: "In a higher, but not necessarily directly adjacent, place." The Court chooses to give "above" its plain and ordinary meaning rather than adopt Fosbel's construction. The term "above" is easily understood, and Fosbel's construction merely restates that ordinary definition in more words. Fosbel's construction does not "aid[] the court [or] the jury in understanding the term as it is used in the claimed invention." *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366-67 (Fed. Cir. 2010). Since "above" is "used in common parlance and has no special meaning in the art," it is not appropriate to adopt Fosbel's construction. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *accord Am. Pat. Dev., Corp. v. Movielink, LLC*, 604 F. Supp. 2d 704, 716 (D. Del. 2009) (rejecting construction that is "merely a verbose paraphrasing of the claim language"). With the

understanding that "above" does not require adjacency, the Court finds that no construction is necessary and the plain and ordinary meaning controls.

### B. "Gas source"

| Vanocur's Construction | Fosbel's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "Point of origin from which gas is obtained"[6] | No construction needed; plain and ordinary meaning. |

The parties next dispute the meaning of "gas source," which appears in Claims 1 and 10. Claim 1 recites "a gas source for providing gas to the first passageway" while Claim 10 recites a step for "introducing gas to the first aperture using the gas source." ('853 Patent at 8:37, 9:16.)

No construction is necessary. Fosbel's proposed construction once again wordsmiths the ordinary meaning of "gas source," complicating a straightforward phrase. In essence, Fosbel proposes to replace the word "source" with a longer synonym, "point of origin," that does not change the meaning or understanding of "gas source." Such substitution provides little aid to either the Court or a jury, so the Court rejects it. *See Funai Elec. Co.*, 616 F.3d at 1366-67.

Of course, the Court must still resolve the parties' dispute over the scope of "gas source," so the Court briefly comments on the parties' disagreement over what structures "gas source" covers. *O2 Micro*, 521 F.3d at 1362. Vanocur submits that the term "gas source" was introduced only to emphasize that gas is flowing through the corbel's blocks. So, it asserts, the gas source need not be any particular type of source (like a gas gun) and can even include the

[6] In its opening claim construction brief, Fosbel appeared to argue in the alternative that "gas source" should be construed to mean either a "gas gun" or a "gas main and gas gun." (Doc. 43 at 576.) Fosbel has backed off this alternative construction in its responsive claim construction brief, so the Court does not consider that alternative further. (*See* Doc. 51 at 1503 ("Fosbel agrees 'gas source' is not limited to a *specific* structural configuration . . . .") (emphasis in original).)

adjacent blocks in the first passageway of the corbel through which gas flows. (Doc. 42 at 423-25.) Fosbel responds that the "gas source" need not be any particular type of source, but it must at must at least be a separate structure from the blocks making up the first passageway. (Doc. 51 at 1501-03.)

The Court agrees with both parties that "gas source" does not require any specific type of source—anything that supplies gas will suffice. But the Court finds that Vanocur's view of the ordinary meaning of "gas source" is too broad. As the '853 Patent recites, the first passageway is made up of "first blocks." ('853 Patent at 8:18.) Since the first passageway is a *conduit* for gas, the first blocks are likewise conduits for gas, not *sources* of gas. Claim 1 illustrates this point in two ways. First, it explains that the gas source "provid[es] gas to the first passageway." ('853 Patent at 8:37.) It would be strange to say that the first blocks provide gas to the passageway because that is effectively saying that the passageway provides gas to itself.[7] Second, the first blocks and gas source appear in different limitations within Claim 1. "[W]hen claim limitations are separately listed within a claim, that implies that the claim's plain and ordinary meaning requires separate corresponding structures." *Magnolia Med. Techs., Inc. v. Kurin, Inc.*, 169 F.4th 1094, 1102 (Fed. Cir. 2026) (emphasis omitted). This strongly suggests that the "gas source" must be something different than a "first block."

Accordingly, the Court finds that no construction is necessary and gives "gas source" its plain and ordinary meaning, with the clarification that the gas source must be a different structure than a first block.

---

[7] In its arguments, Vanocur appears to operate under the assumption that each individual first block needs its own gas source. But Claim 1 indicates that there is a single gas source for the corbel as a whole. (*See* '853 Patent at 8:17-37.) And Claim 1 also indicates that this single gas source supplies gas to the entire first passageway, not to specific first blocks. (*Id.* at 8:37.)

### C. "Third Passageway"

| Vanocur's Construction | Fosbel's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | Indefinite | Not indefinite. No construction needed; plain and ordinary meaning. |

Finally, the parties dispute whether the '853 Patent's description of the "third passageway" is fatally indefinite. The "third passageway" limitation of Claim 1 recites as follows:

> a third passageway extending diagonally from the top of the one of the second blocks to a side of at least one of the first and second blocks.

('853 Patent at 8:34-36.) Fosbel makes four arguments. The Court concludes that, on the record before it, these arguments do not overcome the clear and convincing bar for indefiniteness on their own or in combination. Accordingly, "third passageway" is not indefinite.

***First***, Fosbel argues that the "third passageway" limitation is grammatically confusing because it recites the passageway as extending "to a side of at least one of the first and second blocks." (Doc. 43 at 580-81 (quoting '853 Patent at 8:34-36).) It points out that "at least one of" implies a disjunction—either to the side of the first block *or* to the side of the second block (or both). The claim language, however, uses the conjunction "and."

This argument fails because "and" need not always act conjunctively. The Federal Circuit "ha[s] recognized that, in certain contexts, the word 'and' can reasonably be understood to denote alternatives, rather than conjunctive requirements." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1373 (Fed. Cir. 2022). That is the case here where the use of "at least one of" mandates a disjunctive reading. Given the presumption of patent validity, the Court adopts the disjunctive reading of "and," which precedent expressly permits, rather than a conjunctive reading that puts the claim language at war with itself.

***Second***, Fosbel contends that "to a side of" a first or second block is indefinite because it does not make clear whether the third passageway must extend through the side of a first or second block, or somewhere in the space to the side of a first or second block. (Doc. 43 at 581.) The claim language clarifies that it is the latter: the third passageway must extend somewhere into the space to the side of a first or second block. Elsewhere in Claim 1, the '853 Patent speaks specifically of passageways and apertures extending "through" blocks. (*See* '853 Patent at 8:18-22 ("each of the first blocks comprising a first, substantially horizontal aperture extending ***through*** the first block from a front surface to a back surface and a second, substantially vertical aperture formed ***through*** a top surface of the block"), 8:27-30 ("each of the second blocks comprising a third, substantially vertical aperture extending through the second block from a top surface to a bottom surface") (emphases added).) The "third passageway" limitation does not use the word "through," implying that "to a side of" means something different than "through." *See Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("There is an inference, however, that two different terms used in a patent have different meanings.").

What is more, the claim language is not meant to be read alone when assessing indefiniteness. Rather, courts must read the claim language in light of the patent's specification and prosecution history. *Nautilus*, 572 U.S. at 908. Here, figures from the '853 Patent show that the third passageway need only extend into the space to the side of a first or second block, not through the side of a first or second block. For example, the '853 Patent teaches that notches in lateral blocks (blocks placed to the side of the first blocks) can be used to form diagonal passageways like the third passageway. ('853 Patent at 6:35-39.) Figure 6 below illustrates the lateral blocks (64) next to the first blocks (48) and with notches at their tops. (*See id.* at 6:23-

30.)[8] Figure 8 then shows how, with the addition of second blocks, a diagonal passageway (78) is formed. (*Id.* at 7:3-8.) That passageway runs into the space to the side of the first blocks, but not through the first blocks.

**Fig. 6**




**Fig. 8**




Fosbel protests that (78) depicts the "air passageway" of Claim 4, which is a different structure than the "third passageway" in Claim 1. (Doc. 51 at 1512.) Claim 4 recites the use of lateral blocks containing "an angled notch extending along a portion of each of a top surface and a side surface of the lateral blocks, the notch aligning with an opening in the second blocks to form an air passageway." ('853 Patent at 8:47-51.) That is precisely what (78) depicts: a notch on the lateral blocks that forms a passageway when combined with a second block. So, the Court agrees that (78) depicts this air passageway of Claim 4. The question is whether this air passageway and the third passageway are one and the same.

Usually, the presumption is that they are different because the patent uses different language and the two passageways appear in different limitations. *See Comaper*, 596 F.3d at 1348 (different language usually implies different meaning); *Magnolia Med. Techs.*, 169 F.4th at 1102 (different limitations usually imply different structures). But here, those default

[8] The specification calls (48) a gunblock rather than a first block, but as it is described, a gunblock has all the characteristics of a first block. (*Compare* '853 Patent at 6:26-30, *with id.* at 8:18-26.) The parties also appear to agree that gunblocks are first blocks. (Doc. 42 at 408; Doc. 43 at 567.)

assumptions are rebutted. All passageways in a corbel must either carry air or gas, so the third passageway must be either an air passageway or a gas passageway. (*See* '853 Patent at 3:59-61 (describing how corbels are used to channel air and gas), 5:34-39 (distinguishing between "gas lines" and "air passageways").) Both parties' experts agree that this third passageway carries air, so it is an air passageway. (Doc. 42-2 at 470-73; Doc. 42-3 at 489.)

With this understanding, Claim 4 (which depends from Claim 1), simply narrows Claim 1, it does not create a contradiction as Fosbel contends. That is, Claim 4 requires a specific configuration for the "third passageway" while Claim 1 leaves the configuration of the "third passageway" more open. *See Maxell, Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369, 1373-74 (Fed. Cir. 2024) (citation omitted) ("That there is no contradiction here is confirmed by the fact that it is the ordinary role of dependent claims to add narrowing limitations to the independent claims to which they refer."). For that reason, the illustration of passageway (78) in the specification clarifies the meaning of "to a side of."

Fosbel raises one last objection on this point: The claim language does not specify how close to the sides this third passageway must be. That argument does not move the needle. Definiteness does not call for "mathematical precision." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) (quoting *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1359 (Fed. Cir. 2019)). Patents may use descriptive words like "side" without imposing precise limits on dimensions or measurements as long as those descriptive words are not subjective. *Id.* at 1347-48. The use of such words may make for broader claims, but broadness does not equate to indefiniteness. *Id.* Here, the use of "side" is objective, even if broad. It therefore does not render the claims indefinite.

***Third***, Fosbel takes issue with the '853 Patent as reciting that the third passageway starts from the "top of the one of the second blocks." It suggests that "top" is confusing and leaves POSITAs without guidance. (Doc. 43 at 583.) This argument is specious. What constitutes the "top" of a block is easily understood.

***Fourth*** and finally, Fosbel claims that the '853 Patent's failure to define the path of the third passageway between its start and end creates indefiniteness. However, claims need only "set forth the metes and bounds of the invention; they are not intended to repeat the detailed operation of the method as described in the specification." *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1366 (Fed. Cir. 2022). The claims do not need to trace out the exact path that the third passageway must take. It is enough here that there are discernable parameters—start of the third passageway (top of a second block) and orientation (to the side of a first or second block). Those parameters define the scope of the claim. That there may be multiple third passageways that might satisfy these parameters is a sign of the claims' breadth, not a sign of their indefiniteness. *Niazi Licensing*, 30 F.4th at 1347 ("But a claim is not indefinite just because it is broad.").

For the reasons given above, the Court finds that "third passageway" is not indefinite. The Court also concludes that no construction is necessary. Fosbel argues only that "third passageway" is indefinite and does not provide an alternative construction. The description of "third passageway" also uses common terms with no special meaning. *See Summit 6*, 802 F.3d at 1291. The plain and ordinary meaning of the claim language controls.

## IV. CONCLUSION

For the reasons stated herein, the claim construction arguments are resolved as follows:

| Claim Term | Court's Construction |
|---|---|
| "above" | No construction needed; plain and ordinary meaning. |
| "gas source" | No construction needed; plain and ordinary meaning. |
| "third passageway extending diagonally from the top of the one of the second blocks to a side of at least one of the first and second blocks" | Not indefinite. No construction needed; plain and ordinary meaning. |

This matter will now proceed consistent with the District's Local Patent Rules.

**IT IS SO ORDERED.**

Date: October 20, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE